THE UNITED STATES, APPELLANTS, *v.* ETIENNE ALPHONSO BOISDORÉ, LAURENT BOISDORÉ, SIDNEY BOISDORÉ, MATHILDE AND ALERINE NICOLAS, WIDOW OF MANUEL FABRE DANONY, CAROLINE NICOLAS, ELISE NICOLAS, JOSEPH MANUEL DE LABARRE, DELPHINE VICTOIRE DE LABARRE REAL AND HER HUSBAND CHRISTOVAL REAL, LOUIS DEJEAN, ANTOINE BOISDORÉ, AND MANATTE DEJEAN PARDON AND HER HUSBAND VINCENTE PARDON, HEIRS OF LOUIS BOISDORÉ, DECEASED.

In adjudicating upon an imperfect title under a Spanish concession, this court again adopts the rule laid down in 10 Peters, 330, 331 ; viz. 'Can a court of equity, according to its rules and the laws of Spain, consider the conscience of the king so affected by the acts of his lawful authorities in the province, that he became a trustee for the claimant, and held the land claimed by an equity upon it, amounting to a severance of so much from the public domain, before and at the time the country was ceded to the United States ?

This rule, applied to the following case, brings out the results stated below. ·

In 1783, in consequence of a memorial from Boisdoré, Miro, the acting Governor of Louisiana, issued the following order to Trudeau, the Surveyor-General, viz.: "Don Carlos Laveau Trudeau will establish ·Louis Boisdoré upon the extent of ground which he solicits in the preceding memorial, situated in the section of country commonly called Achoucoupoulous, commencing in front from the plantation belonging to Philip Saucier, a resident of said country, down to the bayou called Mosquito Village Bayou, with the depth down to Pearl River ; the same being vacant, and no prejudice being caused to the neighbors living as well in front as upon the depth ; which measures he will reduce to writing, signing with the aforesaid parties, and will remit the same to me, in order that I may furnish the party interested with a corresponding title in due form."

Boisdoré, in his memorial, had stated that he wished to form an establishment for the whole of his numerous family, on which he might employ all his negroes, and support a large stock of cattle which would be useful to the neighboring city.

The grantee took only a trifling possession of the land by placing a single slave there, and Trudeau never made, nor attempted to make, a survey. In 1808 the Spanish Governor of Florida gave directions to the Surveyor-General of Florida, who drew a figurative plan of a survey, but the Governor of Florida at that time had no jurisdiction over the land.

If Trudeau had made a survey and returned a certificate, it would have been binding, although it might not have conformed strictly to the lines of the original grant. But the description of the tract is so vague and uncertain, that it cannot now be surveyed by an order of the court. The mode directed by the District Court would include four hundred thousand acres ; and it is unreasonable to suppose that the conscience of the king of Spain would have been bound to confirm such a grant, when the grantee neglected to fulfil the obligations which were incumbent upon him.

Besides, there being no given point from which to commence the survey, or to establish the second corner, if the court were to order the mode in which the survey was to be made, it would not be a judicial decree, but an exercise of political jurisdiction.

· THIS was an appeal from the District Court of the United States for the Southern District of Mississippi.

The case arose under the act of 26th May, 1824 (4 Stat. at Large, 52), as revived and reënacted by the act of June 17, 1844 (5 Stat. at Large, 676). A petition was presented to the District Court of the United States for the Southern District of Mississippi, by the heirs of Louis Boisdoré, claiming a large

tract of land lying between the Bay of St. Louis and Pearl River, in the State of Mississippi, and below the thirty-first degree of north latitude.

The circumstances were these.

On the 1st of April, 1783, Louis Boisdoré presented the following application to Miro, the acting Governor-General of Louisiana.

" Señor Governor-General:— I, Louis Boisdoré, a citizen of this city, do, with due respect, present myself to your Excellency and say, that, wishing to form an establishment and cow-house (cattle-raising farm) in the vicinity of the Bay of St. Louis, in the place commonly called Achoucoupoulous, for all my family, which is very considerable, as is well known to your Excellency; and moreover, for the purpose of employing all my negroes on it, and keeping a considerable stock of cattle which I have already on the place; the place being almost uninhabitable, only fit for a *vaqueria* (cattle-raising farm): May it please your Excellency, in consideration of what is above explained, and of the benefit that will result to the capital (city) from such a considerable cattle-raising establishment as the one which I have commenced to form in the said place, and in the vicinity of said city, to grant to me the portion of ground which is vacant in the said place (section of country), known under the name of Achoucoupoulous, running from the plantation of Philip Saucier up to the bayou called Bayou of Mosquito Village, formerly inhabited by Mr. (paper torn off), and running in depth down to Pearl River, in order that I may form with facility the aforesaid establishment and cow-house (cattle-raising farm) for all my family as aforesaid; a favor which I hope, according to justice, from the granting power which is vested in you.

"*New Orleans, 1st April*, 1783.
    (Signed,)                L. BOISDORÉ."

Upon which application, the Governor-General issued the following, viz.:—

"*New Orleans, 26th April*, 1783.
" Considering the sufficient reasons explained to me above, and having regard to the advantage and utility which will result to the capital from the establishment of a cow-pen (*vaqueria*) in that section of the country, little suited to any kind of culture, the surveyor of the province, Don Carlos Laveau Trudeau, will establish Don Louis Boisdoré on the tract of land which he solicits in the preceding memorial, situated in the section of country commonly called Achoucoupoulous, taking

as the front from the plantation of Philip Saucier, a resident of said section of country, to the bayou called the Bayou of the Village of Maringouins, with a depth unto Pearl River, it being vacant, and causing no prejudice to the neighboring inhabitants, as well in front as in depth; which proceedings he will extend in continuation, sign and forward to me, with the preceding, that I may furnish the party interested a title in due form.

" Miro."

In 1808, Boisdoré having died, his widow authorized Don Gilbert Guillemard, a lieutenant-colonel in the army, to obtain an order for a survey from Morales, then in Pensacola. In the petition Guillemard recites as follows: " And although, at that period, on account of the multifarious occupations which engrossed the attention of Charles Laveau Trudeau, the surveyor, in relation to the admeasurement and survey of lands of value, and on account of the great expense to be incurred previously, he did not proceed to the admeasurement and marking out the boundaries of said tract of land, but notwithstanding transported and conveyed thither a large stock of cattle, and placed thereon a stock-keeper, named Augustus Mallet, who remains on to the present day, to preserve the right of property in himself, which the said Boisdoré in his lifetime possessed," &c.

This petition was referred to the fiscal minister of the royal treasury, who, on the 7th of April, 1808, ordered the Surveyor-General to make out a map and certificate of survey to be returned to him.

On the 23d of May, 1810, Pintado addressed a letter of instructions to a deputy surveyor, instructing him to lay down the lines of the grant as follows: —

The demand of M. S. Boisdoré, senior, is conceived in a manner a little confused in regard to the place, for he says in his memorandum of the 1st of April, 1783, that the land which he claims is on a place called Achoucoupoulous, commencing from Philip Saucier's plantation, as far as the bayou called the Mosquito Village, formerly inhabited by Madam Susser, extending back to Pearl River. This description causes sufficient embarrassment in determining the form or figure which the land ought to have; however, as he calls the front the distance from Saucier's plantation to the Bayou of Mosquito Village, the depth, as far as Pearl River, can be understood only by two lines drawn from the said last two points, so as to strike the said Pearl River; that is to say, the easternmost of the three which take this name; and these lines ought natural-

6 *

ly to run to the west, one from Saucier's plantation, and the
other from Mosquito Village. The little sketch (*crouquis*) an-
nexed will give you a clearer idea. Though there is no geo-
metrical precision, it approaches, notwithstanding, to the figure
of the place. You will send it back to me when you have fin-
ished the business," &c.

On the 30th of May, 1810, Pintado, the Surveyor-General,
returned a certificate, with a map. In the certificate he says
that " the map represents and shows the tract of land, with the
shape, figure, and extent, and the boundaries, bounds, and con-
fines, natural and artificial, which should serve for limits," and
then refers to a more particular map to be made hereafter by
any one of his deputies, or by any other person, " so that the
nortnern boundary shall be bounded by lands belonging to the
king, on the south by the bank of the sea, on the east by the
same and a part of the Bay of St. Louis, and on the west by
the above-mentioned Pearl River."

In order to understand the argument and decision, it will be
necessary to insert a sketch of this map.

Under the act of Congress passed on the 25th of April, 1812 (1 Land Laws, 208), this claim was presented to the commissioner appointed for the district east of Pearl River. Mr. Crawford, the commissioner, reported that the land was not cultivated, and not inhabited.

Under the act of Congress passed on the 3d of March, 1819 (1 Land Laws, 316), the claim was again presented to the register and receiver of the land-office at Jackson Court-House, who made the following special report : —

" No. 2. This claim is founded on an order of survey issued by Governor Miro in favor of Louis Boisdoré, confirmed to his widow, Marguerite Doussin; by the Intendant Morales, 4th April, 1808. Although a map or conjectural plan of the limits of the above claim, made by the Surveyor-General, Pintado, the 30th of May, 1810, accompanies the title papers, yet it does not appear to be the result of an actual survey, nor to have been made with geometrical precision, but merely intended for the direction of such persons as might be employed to make the survey. No survey appears to have been made. This claim extends from the Bay of St. Louis to the mouth of Pearl River, and is supposed to contain several hundred thousand acres.

" Land-office, Jackson Court-House, July 11th, 1820.
 (Signed,)      WILLIAM BARTON, *Register.*
         WILLIAM BARNETT, *Receiver.*
" Attest :       JOHN ELLIOT, *Clerk.*"

Under the act of the 24th of May, 1828 (1 Land Laws, 445), this claim was again presented to the register and receiver at Jackson Court-House. All the documents were submitted to this board, together with the depositions of sundry persons, showing the genuineness of the signatures of the Spanish officers, the locality of the land, and its possession.

The commissioners made the following report : —

" *Remarks.*

" Claim No. 4. This claim is founded on an order of survey issued by Governor Miro, in favor of Louis Boisdoré, and confirmed to his widow, Marguerite Doussin, by the Intendant Morales, 4th April, 1808. It does not appear by the title papers that an actual survey was made with geometrical precision ; yet a map, or conjectural plan, definitely fixing the limits of the claim, was made by the Surveyor-General, Pintado, the 30th of May, 1810. This claim extends from Pearl River to the Bay of St. Louis, and is supposed to contain about one hundred thousand acres.

" The additional testimony adduced to us proves incontesta-bly that this claim has been inhabited; and a part of the land kept under cultivation, upwards of forty years. It is also in testimony before us, that the extent of this claim was distinct-ly known to the neighbors, and that the claimant set up his claim to the whole limits contained within the before-mentioned figurative plan. The above claim is forfeited under the Span-ish laws, usages, and customs, for want of inhabitation and cul-tivation within the time prescribed by those laws and regula-tions. Yet, as the inhabitation and cultivation appear to be very ancient, it is conceived that this claim ought to be con-firmed for a reasonable quantity.

(Signed,)                      WILLIAM HOWZE, *Register.*
                               G. B. DAMERON, *Receiver.*

" Attest :
(Signed,)                      VALENTINE DELMAS, *Clerk."*

By an act of the 28th of May, 1830 (1 Land Laws, 468), certain of the claims reported by the above-named register and receiver were confirmed, and the act has this special provision respecting the claim in controversy : " And provided, also, that the claim of the representatives of Louis Boisdoré, numbered four, in report numbered three, shall not be confirmed to more than twelve hundred and eighty acres."

Under this act, a certificate was issued, and a survey made, of the twelve hundred and eighty acres, by Elihu Carver, a deputy surveyor, on the 6th of November, 1830, which was approved by the Surveyor-General south of Tennessee, on the 11th of August, 1832.

The act of Congress, passed in 1844, reviving and reënacting the law of 1824, has been already referred to, in the opening of this statement.

On the 1st of February, 1845, the heirs of Boisdoré presented a petition to the District Court of the United States, which petition was afterwards amended in November, 1845. This amended petition disregarded the figurative plan of Pintado, and claimed that " the form and extent of their grant, to which, by the manifest and only reasonable construction of their con-cession, they are entitled, is that which would result and be produced by regarding as a base an assumed straight line be-tween the two points called for as the front of the grant; viz. from the beginning point, at the north side of Philip Saucier's plantation, to the Bayou of the Mosquito Village ; and thence, by two parallel perpendicular lines, extended from each ex-tremity of said base or front line, till each side line in its ex-tension intersected the Pearl River."

They aver that their title was protected and secured by the treaty of St. Ildefonso of October, 1800, and by the treaty of Louisiana of 1803, and by the laws of nations, and would, by the laws of Spain and the laws of France, have been perfected into a complete title, had not the sovereignty of the country been transferred to the United States.

They aver that their ancestor, the said Louis Boisdoré, and themselves, and their agents and representatives, have asserted their right of ownership, and maintained possession by actual inhabitation and cultivation of part of said land in behalf of the whole, from 1783 to the present time, and kept up a large herd of cattle and a grazing establishment on said land from the date of the grant until many years after the jurisdiction of the Spanish government had been superseded by that of the United States.

To this petition the District Attorney for the United States demurred, but the demurrer was overruled, and he then filed an answer.

The answer of the United States in substance denies that the concession or order of survey conveyed any title whatever, but insists that it is void for uncertainty, and that nothing was ever done, during the existence of the Spanish authority in the territory, to perfect it. It denies any authority in Morales to do what he is alleged to have done. It denies that Louis Boisdoré maintained possession by actual habitation and cultivation, as alleged in the petition, from 1783; and insists that, for want of such inhabitation, settlement, and cultivation, the claim, if it ever had any existence, was forfeited by the laws, usages, and customs of the Spanish government. The United States admit that the claim was presented to several boards of commissioners, but deny that the petitioners, or those representing them, ever complied fully with the acts of Congress, or presented any sufficient and competent evidence of title, or any evidence which would justify a favorable report. That the act of the 28th of May, 1830, provides that it shall not be confirmed to more than twelve hundred and eighty acres, and they rely on that act as a final and complete rejection of the claim, and as such final action upon it by the government of the United States, that the court has no jurisdiction to try it. They admit that they have caused the land to be surveyed, and have granted and sold large portions thereof, and that the settlers and purchasers are now in possession, and they are necessarily parties to the suit. They do not admit that the original Spanish documents and title papers were translated and recorded as required by law, but require full and legal proof. They deny that the claim is protected by the treaties of

1800 and 1803, or by the law of nations, or that it would or ought to have been perfected into a complete title if the sovereignty of the country had not changed. They insist that the concession was conditional, and that the grantee should have occupied and possessed within and for a limited time, and should have established without delay, or within a reasonable time, a cow-pen, for the public benefit; and that a survey should have been made within a reasonable time, and made a part of the public records, so that the public might know what land, if any, was to be separated from the public domain; and say that none of these requisites were complied with, and that the claim was forfeited according to the Spanish laws, customs, and usages. They further answering say, that they have been informed, and charge the truth to be, that the petitioners accepted the donation of twelve hundred and eighty acres, for which Congress confirmed their claim by the act of 1830, and it is now too late for them to disclaim the same; that it was surveyed for them by Elihu Carver, a deputy surveyor, and his survey approved by the Surveyor-General south of Tennessee; and submit that such acceptance of the twelve hundred and eighty acres is a complete extinguishment of their claim or right to any greater quantity; but whether accepted or not, they insist that the act of 1830 was such a final action of the government of the United States as deprives the court of jurisdiction.

A great number of depositions were taken on both sides. Those on the part of the claimants were intended chiefly to prove the genuineness of the documents, the heirship of the claimants, and the locality and possession of the land. The deposition of Bringier, Surveyor-General of Louisiana, was also taken as to the practicability of locating the grant, who concurred with Pintado in his instructions of the 23d of May, 1810, and answered as follows: —

" In answer to the third interrogatory deponent says : In the case stated, I should first survey the front from point to point, and then run back two lines perpendicular to the front, and parallel to each other, to the natural boundary in the rear."

On the part of the United States the depositions (amongst others) of Ludlow and Downing were taken. These persons had both been surveyors-general in Mississippi, and testified as follows.

Mr. Ludlow said: —

" Answer to interrogatory second: I have examined the order of survey of Governor Miro to Louis Boisdoré, dated April 26th, 1783, and believe the survey to be practicable, provided the plantation of Philip Saucier and the Bayou of Mosquito

Village can be identified; and believe the survey should be made by finding a straight line between the above-mentioned points and raising perpendiculars upon said line, at its extremities, extending back to Pearl River; provided there are no controlling circumstances to give direction to the side lines, such as adjoining claims, &c. The instructions of the Surveyor-General Pintado are clearly erroneous, as they, if followed, would give no side line on the west."

Mr. Downing said: —

" Answer to second interrogatory: The phrase in the grant to Louis Boisdoré, ' the front thereof to commence from the plantation of Philip Saucier,' ' and running to the Bayou of the Mosquito Village,' is not sufficiently definite to enable a surveyor to fix upon a beginning point or corner; both the beginning point and the front line seem to be left to the discretion of the surveyor, and it is questionable whether any two surveyors would settle upon the same point for a beginning. I certainly could not adopt the views of Pintado, the Spanish Surveyor-General, for, in the diagram filed in this case, and to which he refers in his instructions, he places what should be the most eastwardly front corner on the back line of the Saucier plantation; this seems to be his understanding of the word *from*, in the grant. A line from this point to the mouth of the Bayou of Mosquito Village would form a base, from each end of which the side lines should run at right angles; or, in other words, the side lines of a Spanish grant, when the course or quantity is not given or particularly specified, shall run ' as near as practicable ' at right angles from the front or shore. This has been the practice on bayous and rivers, as well as on the sea-shore. In the present case, a line run from the mouth of the Bayou of the Mosquito Village, at right angles from a base line between the front corners, would apparently, for several miles, range close along and parallel with the east margin of Pearl River, and consequently conflict with the uniform practice of the location and survey of grants upon all navigable streams and shores. Upon the whole, I think the calls of the grant in question so indefinite that no two surveyors, having regard to the usages governing in surveys of Spanish grants, would coincide in the survey of it as to form, quantity," &c.

In November, 1847, the cause came on for trial in the District Court, when a decree was passed, confirming the title of the claimants, and directing the survey to be made as follows: —

" And it is further adjudged and decreed, that the tract of land, whereof title is so hereby confirmed, shall be surveyed and bounded as follows, namely: having its beginning corner,

at that point on the sea-shore, at the entrance of the Bay of St. Louis, where the southeast corner of Joseph and Martial Nicaise's claim, formerly the claim of Philip Saucier, has been established by the survey made thereof by authority of the United States, as approved and recorded; thence southwestwardly, by the meanders of the sea-shore, to the mouth of East Pearl River; thence up said river to the point on the northeast side where the easternmost mouth of the Bayou Maringouin, otherwise called Mulatto Bayou, intersects and empties into the said Pearl River, and which mouth, so here intended to be described, is identical with that sometimes called the lower mouth of the Pearl River cut-off, and which point shall constitute the second front corner of the claim. From one of these front corners to the other, in a direct course, shall be drawn a theoretic base line, and from each extremity of said base line, and perpendicular thereto, shall be projected the side lines of said claim, to be laid down in a direct course and parallel to each other, till each, respectively, shall intersect the Pearl River, between which two points of intersection the meanders of Pearl River shall constitute the conjunction line of said survey. And it is further ordered, that the surveyor who shall execute the boundary hereby directed shall note and report all intersections of the side lines with the public surveys of the United States heretofore extended over said land; and especially note and show the form and extent of all interfering private claims held adversely to the petitioners, under grant or authority of the United States, which may be found upon said side lines and projecting into said claim, as well as every other such adverse claims as lie wholly within said survey.

" It is further adjudged and decreed, that all such adverse claims and parts of claims as aforesaid, so found within the survey hereby directed, shall be, and the same are hereby, exempted from the operation of this decree, so far as effects their validity; but in place and stead of the lands included in such claims, the petitioners are hereby adjudged to have right and claim to a like quantity of lands from out of the public domain, as by law in such case is provided.

(Signed,) S. J. GHOLSON."

From this decree the United States appealed to this court.

The case was argued by *Mr. Crittenden* (Attorney-General), for the United States, and by *Mr. Volney E. Howard*, with whom was *Mr. Henderson*, for the appellees.

*Mr. Crittenden* made the following points: —

I. That the proceedings of the Spanish authorities of Pen-

The United States *v.* Boisdoré et al.

sacola in 1808 and 1810, relative to the confirmation and survey of the lands in the concession to Boisdoré, were null and void, the Spanish government having then no authority over that part of the country, the same being embraced within the limits of the cession of Louisiana by Spain to France, and by the latter to the United States.  § 14 of Act of 26th March, 1804, erecting Louisiana into two territories (1 Land Laws, 114); Foster and Elam *v.* Neilson, 2 Pet. 254; Lee *v.* Garcia, 12 Pet. 511; United States *v.* Reynes, 9 How. 127.

II. That the concession by Governor Miro to Louis Boisdoré is void, because no land was severed from the public domain by a survey giving it a certain location previous to the treaty of cession, and the description in it is so vague, indefinite, and uncertain, that no location can be given to the land. United States *v.* Miranda, 16 Pet. 156, 160; 15 Pet. 184, 215, 275, 319; 10 Pet. 331; 3 How. 787; 5 How. 26.

Upon looking at the maps in the record, it will be seen that the plantation of Philip Saucier, now belonging to Joseph and Martial Nicaise, is on the Bay of St. Louis, and the first call in the concession is to commence from that plantation.  But from what side or part of it, or from what particular or specific point, is not stated.  Pintado's figurative map commences it in the rear of Saucier's plantation, at the northwest corner; while the claimants and the court below commence it on the sea-shore of the Bay of St. Louis, at exactly the contrary point, — the southeast corner.  The decree says, " having its beginning corner at that point on the sea-shore, at the entrance of the Bay of St. Louis, where the southeast corner of Joseph and Martial Nicaise's claim, formerly the claim of Philip Saucier, has been established by the survey made thereof by authority of the United States."  There is then no specific starting-point under the first call of the concession; and the second call is equally vague and indefinite.

Boisdoré and his heirs, from 1783 to 1800, during which the country remained under the dominion of Spain, seventeen years, had no survey made by which the location of the lands intended to be conceded could be identified; and shall it be left to them now to choose a point for the beginning of a survey, or can the court arbitrarily fix upon such a point?  There is certainly no call in the concession to commence on the Bay of St. Louis, as has been decreed by the court below, and there is therefore no water boundary in the case.  Pintado knew better than to commence on the Bay of St. Louis; for, while he speaks in his letter to Lorrens of the confusion and embarrassment of the description, he keeps so far as he can guess to

the calls of the concession, as to commence from one of the rear corners of Saucier's plantation.

The next call is the Bayou of Maringouins, or Mosquito Village, nearly due west from the Bay of St. Louis, in the direction of Pearl River, but short of it. There is no specific point fixed on the bayou, which, according to the evidence in the case, is from seven to nine miles in length, and navigable for vessels used in the lake trade. Is the mouth or the head intended, or what intermediate point? Monet, one of the witnesses for the claimants, says the head. In answer to the fourth interrogatory for the claimants, he says : " The head of which (bayou) makes one of the corners designated in the title papers of said claim." Others think it should be the mouth, as decreed by the court.

The decree of the District Court, commencing on the Bay of St. Louis, below Saucier's plantation, gives to the claimants, from this point, all around the coast of the sea-shore to the mouth of East Pearl River, thence up that river to the eastern-most mouth of the bayou, which it fixes as the second call of the concession. Now, with respect to the line thus decreed to be run round the sea-coast, the concession is not only vague and uncertain, but there does not appear to be any call whatever in it which sanctions such a construction, or gives it the slightest countenance. The decree then directs that, between the corner thus fixed on the bayou, and the corner on the Bay of St. Louis, a theoretic base line shall be drawn, and from each of its extremities, and perpendicular to it, there shall be drawn, parallel to each other, two side lines, to run until they strike Pearl River, between which lines the meanders of the river shall constitute the conjunction line of the survey. This theoretic base line is about fifteen miles in length.

It will be observed, from the maps of the country, that the line from the mouth of the bayou will run nearly parallel to Pearl River, and strike it about ten miles from its mouth ; and that the other line, commencing on the Bay of St. Louis, will strike it at least fifty miles above, and both may, on an actual survey, go beyond even these distances. The last-mentioned line, it will be remembered, is by the concession declared to commence from the plantation of Philip Saucier ; but so far from the line fixed by the court below commencing on the southeast corner of that plantation being in consistency with the calls of the concession, it actually cuts off the greater part of Saucier's plantation. In fact, these lines run up, instead of back to the river. Pintado, in his letter before mentioned, had a juster notion of what " approached " to the calls of the concession. He says, " This description causes sufficient embar-

rassment in determining the form or figure which the land ought to have; however, as he calls the front the distance from Saucier's plantation to the Bayou of Mosquito Village, the depth, as far as Pearl River, can be understood only by two lines drawn from the said last two points, so as to strike the said Pearl River; that is to say, the easternmost of the three which take this name; and these lines ought naturally to run to the west, one from Saucier's plantation, and the other from Mosquito Village. The little sketch annexed will give you a clearer idea. Though there is no geometrical precision, it approaches to the figure of the place." Boisdoré himself never dreamed of such a magnificent principality for his cow-pen as is claimed by the petitioners, and given by the decree of the court below. See the testimony of Rochon and Benite, filed by the claimants before the second board of commissioners.

The locality, then, of the land not being ascertained, either by the concession or a survey, was not acknowledged by the authorities of Spain, and no effort was made to identify it before the treaty of cession. Nothing was done to withdraw the land intended to be granted from the mass of the public domain, or to show what it was that was to be withdrawn. It therefore remained in Spain at the time of the cession to France, and passed to the United States by the cession of France to them.

III. That the concession was only an incipient step towards a title depending upon the establishing of a cow-pen by Boisdoré within a reasonable time, and after being put in possession of the land, and of a survey being made and returned to the Governor, so that it might be known what land was severed from the public domain; and that none of these being done, there was no just or valid claim on the Spanish government to make a perfect title, and of course none on the United States.

The act of 1824, in describing the claims which might be prosecuted under it, says, *inter alia*, they are such as " might have been perfected into a complete title under, and in conformity to, the laws, usages, and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States."

The considerations which induced Governor Miro to make this gratuitous concession are set forth in it. " Considering the sufficient reasons explained to me above, and having regard to the advantage and utility which will result to the capital from the establishment of a cow-pen." The importance which was attached by the Spanish government to the raising of cattle, is shown in the royal regulation of 1754 (2 White's Recop. 62), and in the Recopilacion of the Laws of the Indies,

49 and 50, No. 74 and 76. And by the same laws it was required that the grantees should take actual possession within three months. Ibid. 51, No. 81. See also the second and third articles of O'Reilly's regulations made in 1770, which were in force in Louisiana at the date of this concession. Ibid. 229.

In this case, the concession directs the Surveyor-General to establish Boisdoré on the land, and to forward his, the Surveyor-General's, proceedings to the Governor, that a title in form might be furnished to Boisdoré. This was never done, and no legal survey was ever made.

The twelfth article of O'Reilly's regulations, above referred to, is as follows: " All grants shall be made in the name of the king, by the Governor-General of the Province, who will at the same time appoint a surveyor to fix the bounds thereof, both in front and depth, in presence of the judge ordinary of the district, and of two adjoining settlers, who shall be present at the survey; the above-mentioned four persons shall sign the proces verbal which shall be made thereof, and the surveyor shall make three copies of the same, one of which shall be deposited in the office of the scrivener of the government, another shall be delivered to the Governor-General, and the third to the proprietor, to be annexed to the titles of his grant." The directions of the concession are in accordance with this regulation, and they are evidently made with reference to it. It furnishes the best criterion of what had to be done by Boisdoré before his grant could be perfected.

Suppose that Boisdoré or his heirs had applied to the Spanish authorities in 1800, seventeen years after the date of the concession to him, without proof that he had occupied the land for the purposes mentioned in the concession for the first five years after date (the earliest occupation in evidence is 1788), or that he had been put in possession, and without any survey or other identification of the land, there was no obligation on them to perfect the title. 10 Peters, 331. The claimants themselves show this, by their own statements, in their application to Morales in 1808.

IV. That the proviso of the act of 1830, declaring that this claim " shall not be confirmed to more than twelve hundred and eighty acres," prevents the recovery sought in this case; and that the said twelve hundred and eighty acres were in full satisfaction of the claim, and were accepted and surveyed for the benefit of those claiming under the petitioners.

In the clause of the act of 1824 conferring jurisdiction on the court, it is declared that the several acts of Congress on the subject of these claims are to be taken into consideration by

the court in deciding on them.   This proviso, therefore, standing unrepealed, is the declared will of Congress that this claim shall not be confirmed for more than is stated.   All claims under incomplete titles in the country acquired from France by the treaty of 1803 addressed themselves to the political power, and Congress had a right to confirm part of a claim, and refuse confirmation for the residue, if they supposed it just to do so.   3 How. 788.

In the case of The United States *v.* Reynes, the court gave effect to the act of 1804, which declares that all grants in Louisiana subsequent to the treaty of St. Ildefonso are null and void.   That the quantity of land given was intended as a full satisfaction is apparent from the words employed.   On the 6th of November, 1830, the twelve hundred and eighty acres were surveyed, and the plat and survey approved 11th August, 1832.   This rendered the title complete, for the act does not direct patents to issue.   It will be seen from the testimony of Carver, Monet, and Daniel, that the twelve hundred and eighty acres cover the plantation of Francis Saucier and part of that of Daniel, who were purchasers under Boisdoré's heirs.   On the question arising on this point, see 3 How. 788.

V.  That on the 26th of April, 1783, the date of the concession by Governor Miro to Louis Boisdoré, the authorities of Spain had no power to make grants in that part of the country where the lands lie, the cession by Great Britain to Spain not having been made until the definitive treaty of peace of the 3d of September, 1783.  1 Kent's Com. 169; Wheaton's Elements of International Law, 572 ; Clark *v.* United States, 3 Wash. 104;  United States *v.* Hayward, 2 Gal. 501; Poole *v.* Fleeger, 11 Peters, 210; Polk's Lessee *v.* Wendell, 9 Cranch, 99; and the cases of Foster *v.* Neilson, Garcia *v.* Lee, and United States *v.* Reynes, cited under the first point.

VI.  That there was no sufficient evidence of the execution of the concession by Governor Miro; and that the proof offered in the shape of *ex parte* affidavits, supposed to have been before the several boards of commissioners, was not competent.

VII.  That the petitioners should have made parties to this suit persons claiming the lands, or any portion of them, under a different title, or holding possession otherwise than under them; and the demurrer ought to have been sustained.

The act of 1824 directs such persons to be made parties. By the second section of the act of 24th May, 1828, to continue in force for a limited time, and to amend, the act of 1824 (1 Land Laws, 442), so much of the last-mentioned act as required claimants to make adverse parties to the suit, or to show the court what adverse claimants there might be on the land,

was repealed. It is said that the act of 1844 revived the act of 1824 as amended by that of 1828. That, however, must depend upon the intention of Congress, to be gathered from the language of the act itself. It refers to the act of 1824 by its name, reciting both its date and title. It does not revive the whole of its provisions, but expressly excludes all such portions of said act as referred to the Territory of Arkansas. Here is a special reference to this act only, in a form of expression as clear and perspicuous as can be employed. Again, it says, " and the provisions of that part of the aforesaid act hereby revived." What is still more conclusive and decisive is the following provision, viz.: " as if these States had been enumerated in the original act hereby revived." The act of 1824 is not only declared to be revived, but reënacted, excluding all such portions of said act as referred to the Territory of Arkansas.

It is not reasonable to suppose that Congress intended to revive and reënact the whole of the act of the 24th of May, 1828, because no part of the first section could be of any avail. No exceptions are made in regard to this act, and no reference is made to it; while in regard to the act of 1824 the parts rejected are carefully excluded, and the residue only is revived and reënacted. The established rules of construction show, that, where a part is named and excluded, the residue is reënacted. *Expressio unius est exclusio alterius.* Co. Lit. 210 a, 183 b; Broom's Legal Maxims, 183, 187.

Every part of the act of 1824, except what relates to the Territory of Arkansas, is revived and reënacted by express words; the court will readily perceive that this case is distinguishable from one reported in 7 Cranch, 382. In that case the language of the reviving act was general in the reference to the acts which had expired. Here it is special and specific, and by several modes of expression negatives any such general inference. There is a plain repugnance between the first and eighth sections of the act of 1824 and the second section of the act of 1828. If, therefore, the law of 1824 is revived and reënacted, it is clear that the law of 1828 remains a dead letter.

Questions bearing a strict analogy have often arisen upon repealing statutes, whether it was the intention of the framers to repeal the whole, or only a part, of the acts to which such repealing statutes were applied. No better mode occurs of illustrating the subject, than by referring to the standard rules of construction which have been adopted by the courts in such cases. The word *repeal* is not to be taken in an absolute sense, if from the whole it appear to be used with a limitation. In every case it is a question of construction whether

it operate as a total, or partial, or temporary repeal. Rex v. Rogers, 10 East, 573.

Where several acts of Parliament upon the same subject, had been totally repealed, and others repealed in part, it was held that it must have been the clear intention of the legislature that only the part of an act particularly pointed out should be repealed. . Camden v. Anderson, 6 Term R. 723; Dwarris on Statutes, 675.

The general principle undoubtedly is, that the repeal of a repealing statute revives the first act, unless the new law contain words indicative of a contrary intention of the legislature; in which case no such consequence follows.

So, it is said, if an act of Parliament be revived, all acts explanatory of that so revived are revived also; which may be true, unless in the latter case, as in the former, the language of the 'act authorizes a different interpretation. The Bishop's Case, 12 Coke's Rep. 7; Tattle v. Grimwood, 3 Bing. 496; Dwarris on Statues, 676; Brown v. Barry, 3 Dallas, 367.

And where some parts of a revived statute are omitted in the reviving statute, they are not to be revived by construction, but are to be considered as annulled. Ellis v. Paige, 1 Pick. 43–45; Rutland v. Mendon, 1 Pick. 154; Blackburn v. Walpole, 9 Pick. 97.

The law does not favor implications in construing a repealing or a reviving statute. Loker v. Brookline, 13 Pick. 342, 348; Haynes v. Jenks, 2 Pick. 172, 176; Dwarris on Statutes, 675.

If, then, the act of 1824 alone is revived, it follows, by express enactment, that petitioners are required to set forth the names of adverse claimants. This point is too plain to require argument.

The claimants may contend, that, as they do not claim the lands held by adverse parties, but an equal quantity to be hereafter located on the public domain, no parties except the United States are therefore interested. It will be observed, however, by the eleventh section of the act of 1824, that it is only after it has been decreed that the title to the lands claimed is valid, that the right of entering other lands accrues.

It may also be said, that to make the adverse claimants parties would oust the jurisdiction of the court, because the parties defendants would be citizens of the same State as the petitioners; and that the provisions of the act of 1824, which requires persons to be made defendants, whether they are citizens of a different State or not, are unconstitutional. It is true that an act of Congress cannot confer a jurisdiction not warranted by the Constitution. But the error of the argument on the other side consists in supposing that the act of 1824 was the exercise

of the power vested in Congress, arising out of the character of the parties to the suit, and not out of the character of the cause. The distinction between these two classes of cases, which is obvious upon a mere cursory reading of the second section of the third article of the Constitution, is thus stated by Chief Justice Marshall, in delivering the opinion of the court in the case of Cohens *v.* Virginia, 6 Wheat. 378 : —

"Jurisdiction is given in two classes of cases. In the first, their jurisdiction depends on the character of the cause, whoever may be the parties. This class comprehends ' all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority.' This clause extends the jurisdiction of the court to all the cases described, without making in its terms any exception whatever, and without any regard to the condition of the party. If there be any exception, it is to be implied against the express words of the article. In the second class the jurisdiction depends entirely on the character of the parties. In this are comprehended ' controversies between two or more States,' &c. If these be the parties, it is entirely unimportant what may be the subject of controversy. Be it what it may, these parties have a constitutional right to come into the courts of the Union."

The twenty-fifth section of the Judiciary Act is a notable example of the exercise of the power vested in Congress arising out of the character of the cause. The act of 1824 is an exercise of the same authority.

The points made by the counsel for Boisdoré's heirs were the following : —

First Point. The grant emanating from Governor Miro of Louisiana, in 1783, was issued by proper authority, and conferred a valid grant of the lands claimed, though the patent or title in form never issued. From its inception to the time Spain was forcibly expelled this district of country in 1811, and from that time to this, no doubt or suspicion has been entertained of the integrity of the grant, and of its possession in good faith. Its extent only has prejudiced the claim. We insist it was assured as private property under the equity of the treaty of St. Ildefonso, of October, 1800, and expressly by the treaty of Louisiana in 1803. And no indulgent construction of the act of 1824 in its favor is requisite to insure its confirmation by this court. 6 Pet. 723, 728, 729 ; 8 Pet. 452 ; 9 Pet. 132, 134, 735, 760 ; 10 Pet. 341 ; 12 Pet. 428, 436, 438, 446, 460 ; 1 How. 24.

Second Point. (This related entirely to the genuineness of the documents offered in evidence.)

Third Point.  The partial and incomplete proceedings under the administration of Morales, in 1808 to 1810, instituted to obtain the title in form, we maintain, were lawful and valid to the extent of the adjudications made.  That the reference of the subject by Morales to his minister of the treasury, the minister's report favorable to the claim, and then and thereupon Morales's order committing the subject of the application to the Surveyor-General for his action, " that a corresponding title might (may) be furnished," are all proceedings of a judicial character, and furnish evidence of confirmation to this extent.  9 Pet. 743 ; 8 Pet. 308.

Pintado's despatch, made in reference to these adjudications, but not in pursuance of them, is no doubt invalid, because manifestly unauthorized by the preceding orders.  Hence the survey and patent failed.

But this adjudication, to the extent it progressed, was within the lawful jurisdiction of the tribunal, and, pertaining to a date long anterior to the treaty of St. Ildefonso, encounters no opposition from the act of 26th May, 1804, § 14.

Fourth Point.  Under the preceding aspect of this case, as well as under the enlarged and liberal equity of the act of 1824, it is of no importance whether any thing was done or suffered, under the government of Spain, for which Spanish authority might have asserted a forfeiture.  The commissioners of 1828–29 report the claim as forfeited under the Spanish law, for want of habitation and cultivation.  But the report has not a particle of evidence to support this position.  It reports habitation only from 1788.  (The grant was 1783.)  But there is no evidence to show that was the beginning of the settlement.  The *enquête* shows it was settled before its date, 1783.  The Minister of the Treasury reports possession from date of the grant to 1808.  And we understand the deposition of Rochon to prove possession from 1784.  The report of 1828, then, is obviously untrue in fact, while the whole adjudication by the tribunals in 1808 repels every such conclusion.  But we assume, as it is indisputable that Boisdoré occupied and claimed this land before the year 1800, and until the United States acquired the possession, that no cause of forfeiture incurred under the government of Spain, before the year 1800, could be made the subject of inquest and escheat under the government of the United States.

Fifth Point.  The act of the 28th of May, 1830, which confirms the report of the commissioners of 1828, and which report recommends this claim for confirmation (for a reasonable quantity) enacts, by way of proviso, that this claim shall not be confirmed to more than twelve hundred and eighty acres.

The record shows that Elihu Carver, United States deputy surveyor, received from the land-office an order of survey, under this act, and, in pursuance of his official duties, and at the cost and expense, and under direction only of the officers of the United States, surveyed the twelve hundred and eighty acres. This law of Congress, and the survey, are interposed in the record as a bar to our claim.

The petitioners disclaim this act; and there is no pretence they ever approved it. No patent has ever issued, the survey is not shown to have been approved, and the record shows sales made of this claim by Boisdoré's heirs to more than five times the quantity so confirmed. The act does not declare a confiscation of the remainder of the claim, and requires no release of one hundred thousand acres of land, for this boon of one thousand two hundred and eighty, being a part thereof. To sustain this bar is to render this proviso in the act of 1830 more potent than the subsequent act of 1844, which gives the right of action under the law of 1824, but which is rendered inoperative as to this case, could this plea in bar prevail.

It is unnecessary to argue what Congress might do in its capriciousness of power. We cannot suppose the court will favor such construction of this act, as imputes the intention to Congress to confiscate this claim, by mere implication of this proviso. Our record proves this claim was regarded good and valid as private property by the Spanish government in 1808. It is unreasonable to suppose the Congress intended to annul or destroy it. 2 Wheat. 203; 7 How. 880; 7 Pet. 86, 87.

Query, If Congress could so confiscate property? 12 Pet. 447. Or could attach a condition and render it obligatory upon such a grant of absolute property, with promise of a title in form? 10 Pet. 306.

Sixth Point. We maintain that the construction of the terms of the grant under the law must define, prescribe, and control the order and direction of the survey; and that the directions, calls, and boundaries prescribed by the decree in this case result from the true and reasonable construction of this grant. 3 Pet. 96, 97; 16 Pet. 199-202.

It is a well-established rule of law, that parol evidence cannot change or vary the written calls in a deed or grant, nor supply calls and boundaries where none are given in the deed.

We have always regarded the boundaries of this claim as the only difficult question in the case. Not that we think it inherently so, but that it has been rendered somewhat questionable from the instructions of the Spanish Surveyor-General Pintado, of the 23d of May, 1810, and by his assumptions in his despatch of the 30th of May, 1810, and his figurative plan therewith.

We will first inquire, What and where is the beginning corner? The grant says, "to commence from the plantation of Philip Saucier." The grant itself shows the plantation of Philip Saucier is at Achoucoupoulous (now Shieldsborough), at the mouth of Bay St. Louis. This is shown by Pintado's instructions of the 23d of May, 1810, and his despatch of the 30th of May, 1810. It is proved also by the witnesses Toulmé, Monet, and Carver. And beside the testimony of these witnesses to the fact, the third volume, p. 9, claim 22, of the American State Papers on Public Lands, shows that this Saucier claim is the same confirmed to Marshall and Joseph Nicaise; and it is shown, too, not to have been surveyed up to the time of confirmation by the United States commissioners. The claim is likewise shown to be a mere order of survey, and not a grant for any specific bounds, except its front on the bay.

The figurative plan furnished by Pintado, with his despatch of the 30th of May, 1810, draws also conjectural or figurative boundaries of the Saucier claim, and starts the line of Boisdoré from what surveyors understand to be a projection of Saucier's north side line, from its northwest corner. We, of course, know that, to have made this effective as a specific starting-point, the lines of the Saucier tract must have been actually laid down. But as we know this was not then done, we have no knowledge from this figurative plan of the call and course which Pintado would have had Boisdoré's north side line run, except we may conjecture he meant it should run in the same course with Saucier's north side line. But nothing shown of that date can fix for us the beginning point of the Boisdoré claim, simply because the Saucier tract was not specifically bounded. But the United States have since surveyed this Saucier claim, and given it established bounds, as Spain might have done. The court below, as our decree shows, construed our first call (to begin from the Saucier tract) to mean from the front (southeast) corner, on the south side of the Saucier claim, and from which our second call takes departure. And if our grant commences from the Saucier grant, it is quite apparent it must be on the side and at the point the decree has assumed.

But Pintado's figurative plan, which appears in this case, commenced the beginning line of the Boisdoré claim on the north side of the Saucier claim; and, though in this respect most favorable to the Boisdoré heirs, is most evidently wrong. And hence surveyor Downing's embarrassment, as per his testimony, on this starting-point. The next call is the Mosquito Bayou, well and clearly established as Bayou Maringouin, or at present Mulatto Bayou. To fix the point of this second

call is the next inquiry. The decree assumes it to be the mouth of that Bayou. This we think obviously right, because the grant of Governor Miro designates the intervening distance between the first and second call the front; and the Minister of the Treasury, Lozada, and the Surveyor-General, Pintado, both so understood it, and surveyor Ludlow, witness for the United States in this case, in answer to cross-interrogatory four, so proves it. And bearing upon this point is the answer of Downing to the fifth cross-interrogatory. But to keep within the undoubted bounds of this second point called for, the decree has assumed the mouth of the Pearl River cut-off, where it enters the Pearl River, as the second point called for, instead of that mouth of the Mosquito Bayou which falls into the Pearl River cut-off; in other words, the second mouth of the Mulatto Bayou, and that which is nearest the point of departure at Saucier's plantation.

Having thus established these two points, and the grant calling for Pearl River as its depth or back boundary, can there be any difficulty in fixing the course which the side lines should run to the Pearl River?

The testimony of five surveyors is found in this record; viz. Carver, Monet, Bringier (Surveyor-General of Louisiana), Ludlow, and Downing, — the two latter both ex-Surveyors-General of Mississippi. All these concur that the side lines should be perpendicular to the base line between the first and second points called for in the grant.

But the answer of the District Attorney of the United States complains that we object to the figurative plan of Pintado shown in the record, and repudiated by the petitioners in their amended petition. The reason for this will be apparent to the court, on inspecting this plan. It conforms in no sort with the calls of the grant. The court, on inspection of the figurative plan, will perceive it gives no side line for the grant, from the Mosquito Bayou to the Pearl River. No construction, which does not violence to the very terms of the grant, can authorize this omission. And the court will see, from Pintado's instructions to Lorreins for the survey of this claim, given only seven days before drawing this figurative plan, that he expressly directed the two side lines from the first two points to be run to the Pearl River. And Surveyor-General Bringier, in answer to the second cross-interrogatory, with Pintado's instructions of the 23d of May, 1810, before him, says, that he understands these instructions as pointing out the same mode of survey as indicated by him, the witness, in his deposition, viz. side lines perpendicular to the base.

But the map or plan given by Pintado, seven days after-

ward, with his despatch of the 30th of May, 1810, to answer in place of a survey, is most clearly wrong, in disregarding the rectangular figure, and giving in fact no side line, in any geodetical sense.

The order of survey in the decree is not only shown to be right by a fair interpretation of the grant, and by the proof in the cause, but it is thoroughly sustained by authority. The usages of Spain, and decisions of the United States, as to the form and figure to be observed in executing such surveys, are identical. In all like cases with this, the rectangular figure is the mandate of the law, where no other is called for. 6 Cranch, 148; 2 Wheat. 316; 3 How. 696, 701, 704.

The case in 6 Cranch, from page 163 to 168, embodies facts not dissimilar to those in this case, and sustains the principles of this decree. And the act of 8th May, 1822, § 4, directs that the form of the Spanish surveys shall guide the officers in the survey of these claims in this district.

Why Pintado, in giving his plan on the 30th of May, 1810, to serve as a survey, chose to discard his own rules given to Lorreins a week previous, we know not, and it is perhaps of little importance to be known. The topography of the country was not then understood, as the maps of the United States surveys now disclose it. It was less known in 1783, when the grant was made. It may have been that Pintado, in 1808, when the territory of Spain in this region had shrunk to this little strip between the Mississippi and Perdido Rivers, imagined himself justified in curtailing the too great generosity of Governor Miro, as exhibited in this grant. We can only suppose some such cause for such obvious disregard to the rights of the claimants under this grant. But our tribunals declare a better morality when they say: "The principles of law cannot in any way be affected by the magnitude of the claims under consideration; every principle of justice forbids it." 6 Pet. 691.

This claim, though large, is of little value, and is useful for little else now than for the object which moved Governor Miro to make the grant; and, large as it is, would make but a limited *vacherie* for the numerous heirs of the grantee, who have come into existence since their rights in this claim have been suspended and deferred.

It was objected by the attorney of the United States, on argument of the demurrer in the court below, that the petitioners had not made all the settlers on this land, who claim title adversely, parties defendant, as originally directed by the first section of the act of 1824. We first answer to this objection, that this provision of the act of 1824 is no longer in

force, being expressly repealed by the act of 24th May, 1828, § 2. And the decision of this court in 8 Howard, 123, is, that the act of 17th June, 1844, only operated to revive the fifth section of the act of 1824.

But this court, in the case of Soulard's Heirs, 10 Pet. 100, where adverse claims were shown in the petition, but the adverse claimants not made parties, held and adjudged the controversy as rightly made between the petitioner and the United States, and this on petition filed in 1824, and of course before the clause referred to was repealed in 1828. But the legislation of Congress by inspection of the laws, rather than the decision of the courts, settles this question.

Mr. Justice CATRON delivered the opinion of the court.

The heirs of Boisdoré filed their petition, in the nature of a bill in equity, pursuant to the act of 1824, revived by that of 1844, against the United States, claiming a decree to a perfect title for a large body of land fronting on the Bay of St. Louis and the Gulf of Mexico, and extending in depth to Pearl River; containing between one hundred thousand and four hundred thousand acres in quantity, depending on the manner in which the claim should be surveyed. A decree was made by the District Court of Mississippi, confirming the claim, and ordering a survey to be made in a particular manner, which will more fully appear hereafter. From this decree the United States appealed; and the first question presented for our consideration is as to the nature and character of the paper title on which the claim is founded.

It was a gratuitous concession, made in 1783, by the Governor of Louisiana, exercising the powers of the king of Spain, and intended mainly for the purpose of pasturage and raising cattle.

A petition was filed by Louis Boisdoré, the ancestor of complainants, representing to the Governor that the petitioner, being an inhabitant of New Orleans, and desirous to form a plantation, or cow-pen, in the vicinity of the Bay of St. Louis, at a place commonly called Achoucoupoulous, for the whole of his petitioner's family; which was very large, as was notorious to his Excellency: and, moreover, that the petitioner might be enabled to employ all his negroes thereon, and to support a large stock of cattle which he had already; which land was, as it were, only inhabitable as, and fit for, a cattle-raising farm: and therefore he proceeds to say: "May it please your Excellency, in consideration of what is above explained, and of the benefit that will result to the capital (city) from such a considerable cattle-raising establishment as the one

which I have commenced to form in the said place and in the vicinity of said city, to grant to me the portion of ground which is vacant in the said place (section of country), known under the name of Achoucoupoulous, running from the plantation of Philip Saucier up to the bayou called Bayou of Mosquito Village, formerly inhabited by Mr. (paper torn off), and running in depth down to Pearl River, in order that I may form with facility the aforesaid establishment and cow-house (cattle-raising farm) for all my family as aforesaid: a favor which I hope, according to justice, from the granting power which is vested in you. New Orleans, 1st April, 1783."

And on this petition the Governor proceeds to grant as follows : —

" New Orleans, 26th April, 1783. Being satisfied with the well-founded reasons expressed above, and with the usefulness and advantage which will result to the capital (city) from the establishment of a cattle-raising farm in that section of country, little fit for any cultivation, the surveyor of the Province, Don Carlos Laveau Trudeau, will establish Louis Boisdoré upon the extent of ground which he solicits in the foregoing memorial, situated in the section of country commonly called Achoucoupoulous, commencing in front from the plantation belonging to Philip Saucier, a resident of said country, down to the bayou called Mosquito Village Bayou, with the depth down to Pearl River; the same being vacant, and no prejudice being caused to the neighbors living as well in front as upon the depth; which measures he will reduce to writing, signing with the aforesaid parties, and will remit the same to me, in order that I may furnish the party interested with a corresponding title in due form..

(Signed,)                                           MIRO."

As the two papers formed the contract between the government and the petitioner, they must be construed together, there being a proposition on one side to do certain acts, and an acceptance on the other, limited by several restrictions. What is stated in either paper as to fact and intent must be taken as true. The facts appearing are, that Boisdoré was an inhabitant of the city of New Orleans; that he had a large family, and that he wished to establish " a cattle-raising farm."

There are several translations of this document from the Spanish, but the true one is, that a stock farm was to be established on the land solicited ; and that the establishment contemplated was to be " for all the family " of the petitioner; and on which he was to employ all his force of negroes.

These were leading motives set forth to the Governor; and

the benefit that would result to the city from such an establishment was also presented as a prominent consideration why, on public grounds, the grant should be made.

On these motives, and their obvious consequence if the cattle farm were established as proposed, the Governor acted.

This contract is to be construed with reference to the laws of the place where and when it was made, and the usages and customs observed in making similar concessions.

By the act of 1824, we are required to exercise the power of a court of equity, and to adjudge in the given case whether a court of equity could, according to the rules and laws of Spain, consider the conscience of the king so affected by the acts of his lawful authorities in the province, that he became a trustee for the claimant, and held the land claimed by an equity upon it, amounting to a severance of so much from the public domain, before and at the time the country was ceded to the United States. This was the rule laid down for our government in 1836, in the case of Smith *v.* The United States (10 Peters, 330, 331), and which has been uniformly followed since.

The first act the claimant was bound to perform was taking possession; in regard to which it is proved by several witnesses, by affidavits taken in 1828, and then filed with the register and receiver at Jackson Court-House in Mississippi, and which proofs are made evidence by the act of 1824, that Boisdoré had had possession of a place on the Mulatto Bayou for forty years before 1828; that the land was cultivated, and cattle kept there; and the register and receiver found that the land had been inhabited and cultivated from 1788 to 1828, by Boisdoré and his representatives; nor do we see any occasion to dissent from this finding.

And, furthermore, as it appears from Boisdoré's petition in 1783, that he had commenced forming a cattle-raising establishment at said place, we deem it fair to presume that the possession and occupation proved to have existed in 1788, and afterwards, did also exist from 1783 to 1788; and so the petition to the Circuit Court, seeking a confirmation, states the fact to have been.

As respects the nature and extent of this occupation, the evidence is obscure. Complainants allege " that their ancestor, Louis Boisdoré, during his lifetime, and his representatives after his decease, occupied, possessed, and cultivated said tract of land, from 1783 until the year 1828; that their ancestor, and his widow and representatives, kept up and supported said plantation and grazing farm upon said land during the whole of that period of time, and fully complied with all the condi-

tions of the grant, and all the laws, customs, and usages of Spain in relation to grants of its public domain."

This allegation is directly denied by the answer, and proof of the facts alleged imposed on complainants. Lewis Daniell, a witness examined by them, states, that in 1824, when he first examined these lands, a few acres were cleared near Mulatto Bayou, which had then the appearance of being very anciently cleared and cultivated; that on it and in its vicinity were found weeding-hoes and axes much worn by use; that the old field was the first settlement made on the east side of the bayou, and was made by Louis Boisdoré, according to the general reputation of the country.

Elihu Carver, another witness of complainants, states, that in 1814 or 1815 he learned from cow-hunters, who were old inhabitants, that the old improvement was called Boisdoré's cowpens; and that there was then another place, within less than a mile, where a person yet cultivated a small field on the east of the said bayou, whom he then understood to be a stock-keeper for Louis Boisdoré; this last place was on the land now owned by F. Saucier.

Samuel White, examined for complainants, states: "I know this bayou, and all the considerable branches thereof; its present name is Mulatto Bayou; it was known by this name as long ago as 1820 or 1821. It took its name, as I always understood, from the mulatto man who lived somewhere near what was formerly called Point Boisdoré, and who was stationed there to take care of the stock of Louis Boisdoré."

By the affidavits taken and filed on behalf of complainants before the register and receiver, in 1828, it appears that th person above referred to was a slave, named Matthew, who belonged after the death of Louis Boisdoré to his widow, and who kept cattle on the land for his widow and heirs. And as this man gave its English name to the bayou, and is proved by White to have kept stock there for Louis Boisdoré in his lifetime, we hold it to be sufficiently established that he had this one slave there, from the date of the grant in 1783; but as the affirmative fact of occupation was imposed on complainants by the pleadings, and as the original improvement on the land was next to nothing, no further presumption can be made that other slaves were there.

The next leading question arises on the necessity of a survey before the land solicited and granted was severed from the public domain; that is to say, whether the grant identifies the land, or whether a survey was required to establish its identity. Boisdoré asked for a grant in the "vicinity" of the Bay of St. Louis, at a place called Achoucoupoulous, running from the

8 *

plantation of Philip Saucier up to the Bayou of Mosquito Village (Mulatto Bayou), and extending in depth down to Pearl River.

The Governor ordered Trudeau, the Surveyor-General, to establish Boisdoré on the tract of land he solicited in the section of country called Achoucoupoulous; taking as the front of said tract, from the plantation of Philip Saucier, a resident of said country, down to the bayou called Mosquito Village Bayou, with the depth down to Pearl River, the same being vacant, and no prejudice being caused to the neighbors living as well in front as upon the depth, " which measures," says the decree, " he will reduce to writing, signing with the aforesaid parties (the neighbors), and will remit the same to me, in order that I may furnish the party interested with a corresponding title in due form"; to wit, a title corresponding to the survey returned to the Governor. Boisdoré's tract was to be located by a survey whose front was to commence from Saucier's plantation, and to end at Mulatto Bayou. When this front was established, and a corner at each end of it marked, and a line drawn from corner to corner, then a perpendicular line drawn from each corner to Pearl River was to be the depth. Such was proved by witnesses to be the uniform practice of surveying Spanish concessions, and this we know to be the true rule aside from proof.

The size of Saucier's plantation appears by survey. It is a considerable tract; its southwest corner points towards the bayou, which lies southwest; one line from that corner running south seventy degrees east one hundred and sixteen chains, and the other line running north twenty degrees east fifty-eight chains. According to our construction of the grant, on either of these lines, and at any point on them, the survey might begin with equal propriety. Taken together, they are seven hundred and ninety-six poles long; and this is all the certainty given for a beginning of the first or front line.

The bayou is six or seven miles long, and a notorious stream, being navigable for vessels of light draught, such as navigate the lakes in its neighborhood. It empties into Pearl River by two outlets, which are some three miles apart. From its upper mouth it extends off from the river northeastwardly, when traced upwards.

At some point of the bayou we are called on to establish the second corner of the front line; and as it is equally marked and navigable for six or seven miles of its length, one part thereof as well as another may be selected.

Tracing Pearl River up the stream from either mouth of the bayou, it extends nearly north in its general course, but bear-

ing more or less to the west. Saucier's plantation is about fifteen miles from the nearest part of the bayou.

To strike a base line from the southeast corner of Saucier's plantation to the upper or easternmost mouth of the bayou, then, the second corner would be on Pearl River, some ten miles above its easternmost mouth; and the western perpendicular side line would run up the river, and nearly parallel with its general course, across a large bend to the west, and again strike the river at nine and a half miles higher up, where the bend turns to the east, and is again reached by the western side line.

The eastern side line would strike the river so high up as to include about 400,000 acres in the survey. And such is the mode of survey ordered by the District Court, and which we are called on particularly to examine. But if the western end of the front line were established farther north on the bayou, then the quantity would be increased in proportion as the corner was located farther north, because the corresponding perpendicular side lines would have to be extended in a direction bearing farther east; and would strike the Pearl River still higher up, if they would reach it at all; which is very improbable as respects the eastern side line, if even the middle of the bayou was determined on as the proper point for the second corner. We think it is impossible to contend that the second corner of the front line should be on Pearl River, and that the side line should run up it, and near to it, and each end of the line be on the river, as the Spanish mode was to front on navigable waters, and not mar their fronts by side lines, located near to, but not on, the river.

That the topography of that section of country in which the Spanish surveyor was directed to survey and mark a tract of land for Boisdoré was greatly mistaken by the governor who made the grant, is now too manifest for controversy, as no front line can be laid down, from the ends of which perpendicular side lines will reach Pearl River in depth, without violating the plainest rules of making Spanish surveys. But for all the purposes of a Spanish survey made by a surveyor-general of the Province, such description as the concession sets forth was sufficient, because large latitude was allowed to his discretion. Had that authorized officer certified that the land marked out by him was "at the place granted," then this fact must be taken as *primâ facie* true; the certificate standing on the foot of a deposition. So this court has uniformly held; as in Breward's case (16 Peters, 147), in Low's case (16 Peters, 166), and especially in the United States v. Hanson (16 Peters, 199, 200). The Spanish governors gave credence to surveys

made by the surveyor-general, as being at the proper place
when it was thus certified in legal form; and the courts of
this country have done the same; and this for the reason that
the acts of the governor and surveyor-general were both on
behalf of the government, each being bound by his duty as a
public officer to protect the king's domain.

No nice conformity was required in a Spanish survey, in
cases where a section of country was designated by the con-
cession without definite objects being given to govern the sur-
veyor; the objects might be loosely and indefinitely stated by
the concession, and yet a survey could be made, subject to the
governor's sanction or rejection, because, in the language of
this court in Hanson's case (16 Peters, 200), " a grant delivered
out for survey meant, not, as with us, a perfect title, but an in-
cipient right; which, when surveyed, required confirmation by
the governor." · If this land had been actually surveyed by
Trudeau, as demanded by the grant, and he had certified that
it was at the place granted, and the survey had been returned
and filed according to the twelfth regulation of Governor
O'Reilly made in 1770; or filed and recorded according to the
fifteenth, sixteenth, and seventeenth regulations of the Intend-
ant Morales of 1799, then such survey would identify the land
granted.  ·

A fair instance is furnished by this record of the Spanish
mode.  The time for making a survey having long expired,
and a new order of survey being necessary before a complete ·
title could be applied for, the widow of Boisdoré in 1808 ap-
plied to the Spanish governor at Pensacola for an order of
survey of this claim, on the supposition that he had authority
to grant the order.  It was made as requested, and Pintado,
the surveyor of the Province, was directed to make the survey.
He did not examine the ground, but drew a figurative plan
for the information of his deputy, to be followed in marking
out the grant.

This plan begins at the southwestern corner of Saucier's
plantation, and pursues a line due west to Pearl River, runs
down the river to its mouth, and then with the ocean to
Saucier's land, and with it north seventy degrees west to the
beginning.  Although no call of the grant but the beginning
was regarded in this plan, yet, if the survey had been actually
made, certified, and returned in conformity to said plan, then
the tract would have been identified according to usage, had
the Spanish jurisdiction continued over the country where the
land lies.  But no actual survey having been made at any
time, it was imposed on the court below, and it is now im-
posed on this court, if in its power, to identify and cause to be

surveyed the land granted. If, however, its identity cannot be fixed, and it cannot be ascertained that any specific tract was severed from the public domain by the grant, at the time Spain ceded Louisiana, then the claim cannot be ripened into a complete title by our decree; as we only have power to adjudge what particular tract of land was granted. Our action is judicial. We have no authority to exercise political jurisdiction and to grant, as the governors of Spain had, and as Congress has. If we were to locate by survey the land claimed at random, in some part of the district of country known as Achoucoupoulous, exercising our discretion as respects the proper place, and to decree on our own survey, and thus divest the United States of title, then we should do what Congress has often done when surveys were ordered of claims founded on settlement, and what a Spanish governor usually did on the return of a survey; we should exercise the granting power; should deal with public lands, — public to the time of our decree, and first made private property by it: ours would be an exercise of political jurisdiction, and not a judicial decree.

In its endeavor to locate this grant, the District Court examined witnesses of experience and capacity as to the possibility of doing so, and came to the conclusion that it could be done; and, as partly stated already, a survey was ordered, to begin at the southern part of Saucier's plantation on the ocean, at the mouth of the Bay of St. Louis, and to meander the ocean to the eastern mouth of Pearl River, and then up the same to the upper mouth of Mulatto Bayou. From this point to the place of beginning a theoretic base line was to be drawn; and from each corner thus established, perpendicular side lines were to be extended to Pearl River for the depth. The witnesses agree that, if the first two corners are established, then the survey can be made, if the side lines would reach Pearl River. They had before them, as we have, the plan of the United States surveys, and the localities established by them, and merely expressed opinions as to the proper mode of survey. They do not agree as to where the first corner or the second corner of the base line should be; and as this is a question of legal construction of the grant, on comparing it with the face of the country, a judicial tribunal is the proper forum, and best qualified to decide the question. Conclusive information was not to be expected from practical surveyors, however experienced; yet their opinions are entitled to much consideration.

Alexander Downing, late Surveyor-General of Mississippi, declares it to be his opinion. that "the phrase in the grant **to**

Louis Boisdoré, 'the front thereof to commence from the plantation of Philip Saucier, and running to the Bayou of the Mosquito Village,' is not sufficiently definite to enable a surveyor to fix upon a beginning point or corner; both the beginning point and the front line seem to be left to the discretion of the surveyor, and it is questionable whether any two surveyors would settle upon the same point for a beginning."

We agree with this witness as respects the beginning point. But we find still more uncertainty in determining where the second corner should be established, as there a range of discretion exists between the head and mouth of the bayou, to an extent of six or seven miles. Our opinion is, that the front line cannot be laid down by a judicial decree, because of the vague description in the grant; and consequently, that no parallel side lines can be established.

How, then, do the rights of complainants stand on the facts, the Spanish laws being adopted as the governing rule? In the first place, their ancestor held the concession in his own possession for twenty years under the Spanish government; that is to say, from 1783 to 1803, without calling for a survey. His claim remained precisely as it was at its date, up to the time we acquired Louisiana. It was presented in 1808 to the Spanish governor at Pensacola, and a survey and complete title solicited; but as no actual survey was made, and as no jurisdiction then existed in the Spanish authorities over that section of country, this step passes for nothing. Some notice of this claim was taken by Commissioner Crawford, whose report condemned it. In 1820 it was filed and recorded in the land-office at Jackson Court-House, and a confirmation sought from Congress on a recommendation of the register and receiver acting as land commissioners. This was in fact the first legal step taken by complainants or their ancestor, after the concession was made. For thirty-seven years they slept on their rights; and in the mean time large masses of the land now claimed by them were granted to others, under both the Spanish and American governments; and this neglect for twenty years of the time was in plain violation of the Spanish laws, and the face of their concession; each requiring a legal survey and specific designation of the land granted.

In the second place, no possession was ever taken according to the terms of the grant. A large tract was solicited by Boisdoré where he could establish his "whole family, and employ all his negroes" in carrying on the establishment. His family was very large, according to his own showing; it consisted of a wife, children, and slaves. A removal to the premises from the city of New Orleans of this whole family was

proposed by Boisdoré, and was contemplated by the Governor; and as a further inducement he was assured that much benefit would result to the capital from such a considerable cattle-raising establishment in its vicinity. It was to be so large as to be of public consideration. These were the notorious promises on which the Governor acted. And what was the compliance on the part of the grantee? He represented that he had then commenced forming his establishment at the place. It appears to our satisfaction, by proof, that five years afterwards he had a single slave there, who kept some cattle, and that a slight patch of a few acres was cleared; and we take it to have been cultivated. The slave continued at the place cleared, or near to it, for many years; say up to 1814 or 1815.

If the establishment had been commenced in 1783, when the grant was made, (and we are bound to hold that it had, as the petition to the Governor alleges the fact,) then it is hardly possible that it could have been on a smaller scale than it ever after continued; there being but a single slave there at any time. It could only have been less, by having no one at all on the premises. It is therefore manifest, that no additional possession was taken by Boisdoré or his representatives, in compliance with the terms of his contract, after its date. He obviously abandoned the idea of taking his whole family to the place, and of employing all his slaves there; and consequently abandoned all intention of having the land surveyed and himself and family established on it by the Surveyor-General. And to hold that such a trifling occupation, in utter neglect of Boisdoré's promises to the Spanish authorities, and the duties imposed by the grant, fastened an equity on the conscience of the king of Spain, and his representative, the Governor of Louisiana, to complete the title, would in our opinion be altogether inadmissible.

Various circumstances must be taken into consideration in this connection. It was the duty of the grantee to do two controlling and requisite acts before he could ask for a completion of his title;—first, to present his concession in due time to the Surveyor-General of the Province; and secondly, to take possession in substantial compliance with the terms of his grant.

Had the survey been returned with the proces verbal, or certificate attached, stating the fact of possession having been given according to the grant, and that the survey did no injury to others; then the effectual and conclusive title could have been issued, divesting the rights of the Spanish government; and then only.

Can it be believed that the Governor of Louisiana intended conclusively to grant a domain of fifteen miles wide and over forty miles long (as large as an ordinary county), for the mere purpose of *a cow-pen?* and that he would have sanctioned a survey and completed the title, if the surveyor of the Province had reported to him, as was his duty, that Boisdoré declined to remove his family, white or black, to the place, or to employ his slaves there, with the exception of a single cowherd; and that the improvement of the place was as slight as it could well be, — that it amounted only to a trifling patch of a few acres? Such a proposition shocks all sense of equity, and is contrary to the settled policy of the Spanish government; which was, to make gratuitous grants for the purposes of settlement and inhabitation, and not to the end of mere speculation.

And, again, the grantee might have his land surveyed, or he might decline; he might establish himself on the land, or decline: these acts rested wholly in his discretion. But if he failed to take possession and establish himself, he had no claim to a title; his concession or first decree in such case had no operation. So the Supreme Court of Louisiana held in Lafayette *v.* Blanc, (3 Louisiana Annual Reports, 60,) and in our judgment properly. There, the grantee never having had actual possession under his concession, the court decided that he could set up no claim to the land at law or in equity. This case followed Hooter *v.* Tippet (17 La. Rep. 109). We take it to be undoubtedly true, that, if no actual possession was taken under a gratuitous concession given for the purpose of cultivation or of raising cattle, during the existence of the Spanish government, no equity was imposed on our government to give any consideration or effect to such concession, or *requête.*

And, in the next place, it was held in Lafayette *v.* Blanc, that if the party took possession, but had no survey executed during the time Spain exercised jurisdiction, this being his own neglect, it lies on him to establish the boundaries of his grant, and to identify his land with such certainty, as to show what particular tract was severed from the public domain; and if he fails to do it, then he has no remedy in a court of justice. And this part of the decision we also approve.

Here there was no survey, and we are of opinion, first, that complainants have not identified any particular tract of land that was granted; and secondly, that, if they had, no possession was taken, or pretended to be taken, such as the agreement between the Spanish authorities and the grantee contemplated. And therefore it is ordered, that the decree of the District Court be reversed, and the petition dismissed.

Mr. Justice McLEAN, Mr. Justice WAYNE, and Mr. Justice McKINLEY dissented.

Mr. Justice McLEAN.

In the opinion of a majority of the court, the grant in this case is rejected, for a want of certainty in its calls. As I cannot agree with this view, I will state, in few words, the grounds of my dissent.

The petition to the Governor-General for the grant represents that Louis Boisdoré, "being desirous to form a plantation or cow-pen in the vicinity of the Bay of St. Louis, at the place commonly called Achoucoupoulous," &c., that he may be enabled to employ all his negroes thereon, and to support a large stock of cattle, prays, " in consideration of what is above expressed and stated, and of the benefit which will result to the capital from a large cow-pen, such as that he had commenced to establish at and near said place, to grant him the parcel of land which may be vacant at the above-mentioned place known by the name of Achoucoupoulous, to commence at the plantation of Philip Saucier, and to run therefrom to the Bayou of Mosquito Village, formerly inhabited by Mr. Loisser, and extending in depth to Pearl River, that he may be enabled to form with facility the above-mentioned plantation and cow-pen for the whole of his family," &c., and is dated 1st April, 1783.

On the 26th of April, 1783, Governor Miro, resident at New Orleans, answers the application by saying: " It appearing to me that the grounds and reasons stated by the petitioner are well founded, in relation to the utility and advantages which will result to the capital from the establishment of a cow-pen in those places which are badly adapted to cultivation, the surveyor of the Province, Don Carlos Laveau Trudeau, shall establish Louis Boisdoré on the tract of land which he solicits in the antecedent memorial, situated at the place commonly called Achoucoupoulous, the front thereof to commence from the plantation of Philip Saucier, an inhabitant of said place, and running to the Bayou of Mosquito Village, and extending in depth to Pearl River, should the same be vacant, and cause injury to no one of the surrounding settlers, either in the front or the depth thereof; whose proceedings shall be made out and signed by him with the before-mentioned persons, and sent to me to furnish the party interested with a title in form."

This tract of land seems never to have been actually surveyed. On the 4th of April, 1808, Gilberto Guillemard applied to the Intendant-General at Pensacola for an order of

survey, representing that Trudeau, the surveyor, by reason of the expense and his pressing duties, had not executed the survey, and a request is made that Pintado, the present surveyor, may mark out the boundaries, &c. The application was granted, but Pintado, instead of making an actual survey, marked out a figurative plan by which the distances could be ascertained. He says: " Two years having elapsed without being able, from the emergency of my business, to attend personally to make out the boundaries, and to make the survey required; and not having at the said place a deputy to execute the same; and that the heirs claiming the same may have an authentic document issued in their favor from which may be made appear the right of property and 'ownership which to the said lands they have and hold in virtue of the said grants; and also the shape and figure which the said tract of land ought to have," &c.

The boundaries, as above designated by Pintado, are shown by a plat in the case. It is true, that the above proceeding in relation to the survey took place after the surrender of Louisiana to the United States, which terminated all foreign power over the territory, but the proceeding shows that there was no forfeiture under the Spanish government, for the want of a survey, or on any other ground; and it also shows that the places called for in the grant were deemed sufficiently certain by Pintado, the Surveyor-General, to make the survey.

What was the nature of the title given by Miro, the Governor-General, to Boisdoré? He petitioned the Governor for a " grant" of the land at the place named, for the purposes stated. The Governor, admitting that " the grounds and reasons stated by the petitioner were well founded, and that his proposal was advantageous to the capital," directed the surveyor of the Province, Don Carlos Laveau Trudeau, to establish the petitioner on the land he solicits, designating the boundaries, &c. If there be sufficient certainty in the boundaries called for, there can be no doubt that the grant of the Governor separates the land from the public domain, and that, in every view, constitutes property under the treaty with France. There were no conditions expressed upon the face of this grant. The consideration is named, but not as a condition.

The petition which is referred to in the grant constitutes a part of it. The vicinity of the Bay of St. Louis, the place known by the name of Achoucoupoulous, the plantation of Saucier as the beginning point called for, " and to run therefrom to the Bayou of Mosquito Village, and extending in depth to Pearl River"; — all these calls are identified, and shown by parol evidence and the maps which are in the case.

And the great question is, whether, from the calls of the grant, the survey can be executed. These calls are clear and specific. They are the plantation of Philip Saucier, on the Bay of St.. Louis, the rivulet or Bayou of the Village of Mosquitos, in the district called Achoucoupoulous, and extending in depth to Pearl River. All these calls are proved to exist, and they are more special than nine tenths of the calls in the Spanish grants which have been confirmed.

Pintado, by his figurative plan embracing those calls, seems to have had no difficulty in directing how the survey should be made. And he was the Surveyor-General of the Province under the Spanish government, and may be presumed to have been well acquainted with the Spanish laws and usages on the subject of surveys. Morales, who sanctioned the grant in 1808 by ordering the survey, was Intendant-General, and had the same powers to grant land as the Governor-General previously had, and he was distinguished for his general intelligence and high capacity to represent his sovereign in the important duties which were committed to him. The grant was also sanctioned by Juan Lozado, the fiscal minister *pro tem.*, to whom the petition of Guillemard in behalf of Boisdoré's representatives was referred, and who recommended that the survey be made.

L. Bringier, a witness, states, " that he has been a surveyor for upwards of thirty years, and for more than twenty-five years Surveyor-General of the State of Louisiana, during which period he has had the records of Spanish surveys in his charge, and had frequent occasion to refer to them, and survey lands in conformity to them ; that he understands the Spanish language ; and he says that he agrees with Pintado as to the mode of running the lines of the survey. He thinks the description of the grant is sufficient to enable a surveyor to make an accurate survey of it," &c.

Elihu Carver, who says that he is a practical surveyor, on being asked how he would survey a Spanish concession which calls for two points as the front upon the sea-shore or a water-course, and calls to run in depth to another water-course for quantity, answers " that he would run from one of the first points back to the watercourse a distance equal to the front given, thence direct to the last point in the front." He says that he has surveyed many Spanish claims, and, except one, he never found the boundaries all round. That he does not pretend to be sufficiently acquainted with the Spanish customs and usages to pronounce upon the claim in question.

B. A. Ludlow states, that he is a practical surveyor, and has held the office of Surveyor-General for the district south of Tennessee. He has examined the survey of Boisdoré, and be-

lieves the survey to be practicable, provided the plantation of Philip Saucier and the Bayou of Mosquito Village can be identified. " The survey should be made," he says, " by finding a straight line between the above-mentioned points, and raising perpendiculars upon said line, at its extremities, extending back to Pearl River," &c. " Exceptions to this rule," he says, " sometimes occur by watercourses or the lines of other claims causing a deviation," &c. He says he is familiar with the sea-shore which constitutes the front of the Boisdoré claim. From his general knowledge of the country, he can see no material difficulty in making the survey of the claim, &c.

A. Downing has been many years a practical surveyor, and has held the office of Surveyor-General of the public lands for the State of Mississippi. He says, " the phrase in the grant to Boisdoré, ' the front thereof to commence from the plantation of Philip Saucier,' and ' running to the Bayou of Mosquito Village,' is not sufficiently definite to enable a surveyor to fix upon a beginning point or corner; both the beginning point and the front line seem to be left to the discretion of the surveyor, and it is questionable whether any two surveyors would settle upon the same point for a beginning. I certainly could not adopt the view of Pintado, the Spanish Surveyor-General, for in the diagram filed in the case, and to which he refers in his instructions, he places what should be the most easterly front corner on the back line of the Saucier plantation." And he says the side line " from the mouth of the Bayou of the Mosquito Village, at right angles from a base line between the front corners, would, apparently for several miles, range close along and parallel with the east margin of Pearl River, and consequently conflict with the uniform practice of the location and survey of grants upon all navigable streams and shores."

This is the substance of the evidence in the case in relation to the calls in the grant. And it must be remarked, that all the witnesses, with the exception of Downing, think that the calls of the grant are sufficient to enable a surveyor to mark out the boundaries. Downing supposes that no two surveyors would agree on the beginning corner, or as to the second point and lines called for. But in this he is mistaken. In the first place, the Spanish authorities who held the calls of the grant sufficient are Miro, the Governor-General who issued it, and Morales, the Intendant-General, Trudeau and Pintado, surveyors-general, and Lozado, the fiscal minister. These, when connected with the statements of the above witnesses, would seem to leave little doubt as to the sufficiency of the calls of the grant.

Upon this question we must not forget that we are acting upon a Spanish grant, and are governed by Spanish laws, usages, and customs. And if such a grant were valid under the Spanish government, and there has been no forfeiture of the right, we are bound by the plighted faith of our own government to sustain the grant. And in administering this foreign law, we must ascertain and regard the usages under it, in the acquisition of titles to land. This is a universal principle, respected by all courts, in the administration of justice. Parol evidence must be heard to establish those usages, in addition to what may appear from the action of the local tribunals. In the States of Virginia, Kentucky, Tennessee, North Carolina, Pennsylvania, and in a large district of country in Ohio, the usages in making entries and surveys of lands constitute the laws of the respective States, the usage of each State differing more or less from that of the others. One instance only will be named as peculiar, perhaps, to Kentucky and Ohio. The holder of a warrant for one thousand acres locates it, and in his survey includes fifteen hundred acres of land, more or less, and yet his survey is held valid. This, to one wholly unacquainted with such a rule of decision, would be thought unreasonable, and might be disregarded; and yet it is a rule of property which no court can reject.

To establish entries under this system parol evidence is always heard, as to the calls made, and the objects called for, &c. And although the survey may deviate from the calls of the entry, it is held valid, if it interfere with no prior rights. This rule of decision, so firmly established in our own country, should be applied with an enlarged liberality when acting on land titles acquired under a foreign government, of whose language and usages we have comparatively but little knowledge. The act of Congress of the 26th of May, 1824, revived and applied to these titles by the act of the 17th of June, 1844, under which we exercise jurisdiction, provides that a claimant under " any French or Spanish grant, concession, warrant, or order of survey, legally made, granted, or issued before the 10th of March, 1804, by the proper authorities, to any person resident in the Province of Louisiana," &c., " which might have been perfected into a complete title, under and in conformity to the laws, usages, and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States, may file his petition," &c. And the proceeding is required " to be conducted according to the rules of a court of equity," &c.; and the court is authorized " by a final decree to settle and determine the question of the validity of the title, according to the law of nations, the stipu-

9 *

lations of any treaty, and proceedings under the same, the several acts of Congress in relation thereto, and the laws and ordinances of the government from which it is alleged to have been derived," &c.

I will refer to some cases where grants similar to the one under consideration have been held valid by this court. In the United States v. Percheman, 7 Peters 54, the petitioner asked " two thousand acres of land in the place called Ockliwaha, situated on the margin of St. John's River." Governor Estrada says, " I do grant him the two thousand acres of land which he solicits, in absolute property, in the indicated place." The survey of this land was not executed until the 20th of August, 1819, after the treaty of cession. The title was confirmed by this court.

In the case of the United States v. Clarke, 8 Peters, 446, the petitioner solicited a grant of the quantity of land which the Governor of Florida had thought proper to assign to the water-mills, equivalent to five miles square; which lands he solicits " on the western part of St. John's River, above Black Creek, at a place entirely vacant, known by the name of White Spring." In the grant it is declared, " A title shall be issued comprehending the place and under the boundaries set forth in the petition." This was also confirmed.

In the case of the United States v. Levi, 8 Peters, 479, the grant was " for twenty-five thousand acres of land, south of the place known by the name of Spring Garden, in this form: twelve thousand acres of them, adjoining the lake or pond called Second, and known by the name of Valdes, and the remaining thirteen thousand acres on the pond farther above the preceding, known by the name of Long Pond, the whole west of the River St. John." The survey was executed on the 2d of August, 1819. This court confirmed the title. Another grant in the same case was for " seven thousand four hundred acres, lying on a stream running from the west, and entering the River St. John, and called in English the Big Spring, about twenty-five miles south of St. George's Lake, one of the fronts of the said tract to be on St. John's River, and to be divided in two parts by the stream aforesaid." This survey was made on the 5th of April, 1821. The title was confirmed.

In the same case another grant, which was confirmed by this court, was for eight thousand acres, being part of a larger parcel containing ten thousand acres, &c., " five thousand of them in a hammock to be found five or six miles east of Spring Garden, and the remaining five thousand west of the River St. John, contiguous to a creek called Black Creek, near Fleming's Island and the pond called Doctor's Lake."

The United States v. Boisdoré et al.

Another grant in the same case was confirmed for " twenty thousand acres," described as lying " in the hammocks known under the names of Cuscowillo and Chachala, situate west of the place of the River St. John's where there was a store of the house of Panton, Leslie, & Co., and about thirty miles from it."

Similar citations might be made from any of our reports of the last fifteen or twenty years, but the above are sufficient to show the course of the Spanish authorities in granting lands, and the decision of this court upon such grants.   Many of the surveys, it will be observed, were made under Spanish authority, after Florida was ceded to the United States.

The reader, if any one shall read the above citations and the grant of Boisdoré, will be struck with the much greater certainty in the calls of his grant, than in the calls of any one of the grants above stated.   And yet they were confirmed, and his is rejected for want of certainty.   By virtue of what law this greater certainty is now required in the calls of a grant I am not able to determine.   In my own mind I am assured it cannot be under the Spanish law.   And I am greatly mistaken if our decision on Spanish titles must not rest on Spanish law.

The tract claimed is said in the argument to be large.   Of what importance is that to a court which deals with established principles ?   In this respect we can exercise no discretion. If the claim of Boisdoré was property under the Spanish government, it is protected by the treaty.   That it was so considered under the usages and acts of the Spanish government, to my mind, is clear.   I therefore dissent from the judgment of the court.

Mr. Justice WAYNE.

I dissent from the opinion of the majority of the court in the case, concurring with all the views expressed by my brother McLean, and dissenting from every position of fact or argument in the opinion of the court.   In my opinion, the opinion of the court is a departure from all heretofore adjudged by the court in respect to the right of property secured by our treaties with France and Spain to the inhabitants of Louisiana and Florida.

## Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the Southern District of Mississippi, and was argued by counsel. On consideration whereof, it is the opinion of this court, that the grant of petitioners had no identity; and cannot be surveyed,

so as to give it boundaries, And secondly, if it could be iden-
tified, that no occupation and inhabitation·were ever taken ac-
cording to the terms of the. grant, and therefore the claim is
without equity according to the laws of Spain.

Whereupon it is now here ordered, adjudged, and decreed
by this court, that the decree of the said District Court in this
cause be, and the same is hereby, reversed, and that this cause
be, and the same is hereby, remanded to the said District Court,
with directions to dismiss the petition of the claimants in this
cause.